# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **ERIC MITCHELL,** | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action Number |
| **vs.** | ) | **2:12-cv-2461-AKK** |
| | ) | |
| **EVERGREEN TRANSPORT, LLC,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Eric Mitchell, who is African American, claims his former employer, Evergreen Transport, LLC ("Evergreen"), discriminated against him based on his race and discharged him in retaliation for complaining about discrimination, in violation of Title VII of the Civil Rights Acts of 1964 ("Title VII"), and 42 U.S.C. § 1981. Evergreen moved for summary judgment, doc. 32, contending that Mitchell cannot establish a prima facie case of discrimination or retaliation, or, alternatively, cannot demonstrate that the proffered reason for his termination is pretextual.[1] The motion is fully briefed, docs. 33, 37, and 38, and for the reasons stated below, is **DENIED**.

---

[1] Evergreen also moved to strike Paragraph 4 of Mitchell's declaration, doc. 39, which states, "About the memo John Dykes wrote about me reporting to him that William Miller yelled at me 'N----- Please,' I have to say I do not remember that. I will say that, if I went into the office and reported it to John, then it happened." Doc. 36-3, ¶ 4. In light of Mitchell's admission that he does not have personal knowledge of Miller's racial slur, the motion to strike Paragraph 4 is **GRANTED**. *See* Fed. R. Civ. P. (c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge.").

## I. SUMMARY JUDGMENT STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Id*. However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (*per curiam*) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560,1563 (11th Cir. 1989)).

## II. <u>FACTUAL BACKGROUND</u>[2]

Evergreen hired Mitchell as a driver in July, 2011. Doc. 34-1 at 8–9. Mitchell worked the night shift from 6:00 p.m. to 6:00 a.m., hauling lime from Evergreen's terminal in Calera, Alabama, to U.S. Steel in Fairfield, Alabama. *Id.* at 11. Evergreen discharged Mitchell on October 4, 2011. *Id.* at 9.

During his employment, Mitchell experienced several racial slurs. The first occurred a month after his hiring, when Randy Cox ("Cox"), another driver, referred to Mitchell as the "N" word. *Id.* at 21–22. Sometime later, Cox again called Mitchell the "N" word. *Id.* at 21. Mitchell reported Cox to Safety Supervisor John Dykes ("Dykes"). *Id.* at 23. Later that month, William Miller ("Miller"), another driver for Evergreen, yelled "N----- PLEASE" at Mitchell after a verbal altercation regarding preloading trailers. Doc. 34-3 at 14. Mitchell also reported Miller to Dykes, who, in turn, reported the incident to the Director of Safety and Compliance, Randy Watson ("Watson"), and the Human Resources Manager, Sharon Cook ("Cook"). *Id.*; docs.

---

[2]These are the "facts" for summary judgment purposes only and may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). The court has gleaned these facts from the parties' individual submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. Finally, all reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).

34-5 at 5–6; 34-3 at 8; 36-2 at 3.³

In late August or early September 2011, about two weeks after their verbal altercation, Mitchell and Miller engaged in a physical altercation. Doc. 34-1 at 23. The incident started after both arrived at the plant to load lime. After loading his trailer, Mitchell left his truck at the loading station and went into an office to retrieve paperwork. *Id.*; Doc. 34-3 at 4. When Mitchell returned, he discovered that someone had moved his truck. Doc. 34-1 at 23. As a result, Mitchell asked Miller if he moved the truck, which prompted Miller to respond, "F you and your truck." *Id.* Apparently feeling that he needed to do more than curse, Miller jumped off the steps of his truck and chest bumped Mitchell, causing both men to grab each other and tussle. *Id.* At the end of their skirmish, the two men visited the dispatcher, who told them to return to work and promised to sort out the issue the next morning. *Id.* at 24–25. However, Evergreen waited a few days to address the incident. *Id.* at 25. In the interim, the situation escalated. For example, Miller tailgated Mitchell one night while the two traveled back to the plant from U.S. Steel. *Id.* at 27. That same night, as Mitchell

---

³There is some confusion over who called Mitchell the "N" word. Mitchell indicates that Cox used the racial slur twice, and that no one else at Evergreen directed such language at him. Doc. 34-1 at 23. However, in reporting an incident to Dykes, Mitchell alleged that Miller called him the "N" word as well. Doc. 34-3 at 14. Although Mitchell's declaration regarding this occurrence was stricken, *see supra* note 1, there is sufficient evidence in the record from which a reasonable jury could conclude that Miller yelled a racial slur at Mitchell. *See Anderson*, 477 U.S. at 248 (it is not the court's duty to weigh the evidence). Taken in a light most favorable to Mitchell, Cox called Mitchell a racial slur twice, and Miller called him a racial slur once.

unhooked his trailer, Miller tried to hit him with his truck. *Id.* 25–26. Mitchell reported both incidents to the dispatcher. *Id.* 26–27.

On September 2, 2011, Watson conducted a counseling session to discuss the altercations between Mitchell, Miller, and Cox. Docs. 34-3 at 6; 34-1 at 87. Because each party denied the allegations against him and had no witnesses to support their respective contentions, Watson was unable to make any determinations. Doc. 34-3 at 5–6. Nonetheless, Watson issued each driver a final warning and purportedly told Mitchell that he did not believe any of his allegations.[4] Docs. 34-1 at 54; 34-3 at 6.

On October 3, 2011, Ronnie Kent ("Kent"), Vice President of Operations, received a notice that Mitchell and Miller failed to follow dispatch orders regarding preloading trailers. Docs. 34-2 at 11, 27. As part of their duties, Evergreen required each driver to preload his trailer at the end of each shift. *Id.* at 9–10. This entails loading the trailer with lime at the Lhoise lime manufacturing plant, driving it half a mile to Evergreen's terminal, and leaving it there before leaving for the day. Docs. 34-1 at 15; 34-2 at 12. Mitchell contends that he simply objected to preloading a particular trailer that he believed carried too much weight for him to legally transport, and that he complied with the dispatcher's instruction for him to preload a different

---

[4] Watson claims that he told all three drivers, "It's obvious that one or more of you are lying to me." Doc. 34-3 at 6.

trailer. Doc. 34-1 at 18, 50. In any event, the next day, Kent initiated a counseling session by conference call to discuss these issues with Mitchell, and discharged Mitchell when Mitchell purportedly stated that "he would not [preload] . . . [a]ny trailers." Docs. 34-2 at 11, 13; 34-1 at 32. Allegedly, Kent also told Mitchell that he did not believe Mitchell's complaints of discrimination.[5] *Id.* at 52. Kent discharged Miller the next morning for also refusing to preload trailers. Doc. 34-2 at 16.

### III. Analysis

Mitchell maintains that discriminatory and retaliatory animus motivated his discharge. *See* docs. 1, 9, 30, and 31. Since Title VII and § 1981 claims "have the same requirements of proof and use the same analytical framework, [the court] shall explicitly address [Mitchell's] Title VII claim[s] with the understanding that the analysis applies to the § 1981 claim[s] as well." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). In that respect, because Mitchell is relying exclusively on circumstantial evidence, the burden of proof is ordinarily governed by the *McDonnell Douglas* framework. *Id.* at 1331 (discrimination); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) (retaliation). The *McDonnell*

---

[5]It is unclear whether Kent actually said this because Mitchell contradicts himself several times during his deposition testimony. *See* doc. 34-1 at 32, 52, 54. There is evidence that Mitchell attempted to bring up his discrimination complaints during his termination meeting, but was quickly informed that the meeting was to discuss his performance issues. Docs. 36-2 at 5; 34-4 at 4–5.

*Douglas* framework first "requires the plaintiff to create an inference of discrimination [or retaliation] through [his] *prima facie* case." *Springer v. Convergys Customer Management Group, Inc.*, 509 F.3d 1344, 1347 (11th Cir. 2007) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory or non-retaliatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802; *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). If the employer meets this burden, the plaintiff must show that the proffered reasons were pretextual. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993).

### A.   Discriminatory Discharge

The parties spend multiple pages arguing whether Mitchell can establish a prima facie case since he does not offer an appropriate comparator. *See* docs. 33 at 15–16; 37 at 7–9; 38 at 2–5. The court does not have to resolve whether *Jones v. Gerwens*, 874 F.2d 1534 (11th Cir. 1989), as Mitchell contends, or *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306 (11th Cir. 1998), *superseded in part,* 151 F.3d 1321 (11th Cir. 1998) (denial of rehearing), as Evergreen contends, is dispositive of the issue because "establishing the elements of the McDonnell Douglas framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case.

Accordingly, *the plaintiff's failure to produce a comparator does not necessarily doom* the plaintiff's case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (emphasis added). Instead, where, as here, the plaintiff "presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent"—the essential element of a claim for discrimination—"the plaintiff will always survive summary judgment." *Lockheed-Martin*, 644 F.3d at 1328. And indeed, "a triable issue of fact exists if the record, viewed in the light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Id.* (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 733 (7th Cir. 2011)).

Mitchell creates the "triable issue concerning the employer's discriminatory intent" in light of his testimony that Randy Watson told him shortly before the discharge that Watson did not believe his complaints of discrimination and harassment—a fact Watson disputes, and a similar statement which Kent may or may not have repeated while discharging Mitchell—and evidence that Mitchell only declined to preload a specific trailer he felt was too heavy and not *all* trailers, as the decisionmaker Kent contends. Whether Mitchell had the right to reject a load for safety reasons—presumably he did since the dispatcher simply assigned him another load—is irrelevant at this juncture since Kent claims he discharged Mitchell

purportedly for stating "he would not [preload] . . . [a]ny trailers." Doc. 34-2 at 13. This dispute regarding what actually happened and the possibility that Evergreen empowered its drivers to reject loads for safety reasons, coupled with the alleged comments by Watson and Kent that they did not believe Mitchell's reports of discrimination, are sufficient at this juncture to create a triable issue concerning Evergreen's discriminatory intent.

### B.   Retaliatory Discharge

To make a prima facie case of retaliation, Mitchell "must present evidence that: (1) he engaged in statutorily protected conduct; (2) he was adversely affected by an employment decision; and (3) there was a causal connection between the statutorily protected conduct and the adverse employment decision." *Drago v. Jenne*, 453 F.3d 1301, 1307 (11th Cir. 2006). The issue here is whether Mitchell engaged in statutorily protected conduct. To demonstrate that he engaged in a protected activity under the opposition clause,[6] Mitchell "must show that []he 'had a good faith, reasonable belief that the employer was engaged in unlawful employment practices.'" *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1312 (11th Cir. 2002) (quoting *Little v. United Tech.,*

---

[6]"Title VII's retaliation provisions do protect certain kinds of activity. Under the opposition clause, an employer may not retaliate against an employee because the employee 'has opposed any practice made an unlawful employment practice by this subchapter.'" *E.E.O.C. v. Total System Services, Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000) (quoting 42 U.S.C. § 2000e–3 (a)).

*Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)). "It . . . is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable." *Little*, 103 F.3d at 960.

### 1. Mitchell engaged in statutorily protected conduct

Evergreen argues that it is not objectively reasonable to believe Mitchell's complaints were protected because the complaints only involved a co-worker's use of a racial slur twice in a single day. Doc. 33 at 22–24. This contention overlooks that Mitchell contends that he reported two different co-workers, Cox and Miller, for directing racial epithets at him on three separate occasions. Docs. 34-1 at 21–22; 34-3 at 14. Moreover, Mitchell also reported Miller for harassing him by moving his trailer, chest-bumping him, trying to run him over, and tailgating him on the highway. Under these facts, it was reasonable for Mitchell to believe that Miller and Cox harbored racial animus against him in light of the racial slurs directed at him, and that the harassment was therefore based on race. Further, it was objectively reasonable for Mitchell to believe that these incidents, occurring within a two month period, and which included some physically threatening situations, constituted unlawful racial harassment. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (quotation marks and citations omitted) (alterations in original) ("[W]hen the

workplace is permeated with [racially] discriminatory intimidation, ridicule, and insult[] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated."). Accordingly, Mitchell's complaints regarding Cox and Miller are protected by the opposition clause of Title VII's anti-retaliation provisions.

### 2.    Mitchell has established pretext

Evergreen's alternate contention, i.e., that it has a legitimate, non-retaliatory reason for discharging Mitchell, also falls short at this juncture because of a factual discrepancy regarding the basis for the discharge. As stated previously, Mitchell maintains that he rejected a single assignment because of safety concerns, that Evergreen simply assigned him another trailer to preload, and that he actually performed his job duties that night. Again, whether Mitchell had the right to reject a trailer for safety reasons is a matter the court does not have to address at this juncture in light of Kent's testimony that he discharged Mitchell because Mitchell "said he would not [preload] . . . [a]ny trailers." Doc. 34-2 at 13. Moreover, while Evergreen may indeed be within its right to discharge Mitchell for rejecting an assignment even for safety reasons, where, as here, a decisionmaker articulates a reason for discharge that is inconsistent with the actual events, it makes this matter best suited for a jury since it will involve credibility determinations.

## IV. Conclusion

For the aforementioned reasons, Evergreen's motion for summary judgment, doc. 32, is **DENIED**.

**DONE**, this 15th day of November, 2013.

                                                 _____
                                                    **ABDUL K. KALLON**
                                          UNITED STATES DISTRICT JUDGE